Please call the next case. 092095-520 South Michigan Ave. v. IL Department of Employment Security May it please the Court, my name is Elizabeth Reynolds. I represent UNITE HERE Local 1 on behalf of the claimants. And before I get to the merits, I would like to address briefly the burden of proof issue. I assume the Court has seen the motion to supplement the record that I filed yesterday. We did, but we're going to hold off on deciding that motion until the record is available. We're not going to anticipate its certified nature or even that it exists, so we're going to hold off on it. But I understand your decision to go on the burden question, but I'd like you to address just very quickly how it is that the Department of Employment Security can make such a finding three weeks after when your own evidence, the evidence that you presented, suggested that the hotel was suffering greatly under the labor dispute, that it had lost, according to your own leaflets, 400,000, I don't know what time frame that was, but lost a lot of money, that you in fact were calling prospective guests not to come to the hotel and you were trying to discourage as many people as you could from staying at the hotel. Didn't you find it a little odd that a decision could be made that three weeks after the strike starts that the hotel was running back to normal? No, Your Honor, I don't find that odd for two reasons. One, which is general to the case law and labor disputes, and the other is specific to the hotel industry. As a general matter, in Travis and in all the other cases that the courts have decided with respect to whether a work stoppage exists, there are not any cases that I'm aware of where the court has looked to whether there was picketing outside, whether there was a loss of business. That just hasn't been a factor that's considered. The question is what's going on inside the plant, inside the facility, and are they getting the work done? So to some extent you're saying that the hotel responded very well to the labor dispute, was able to get temporary work agencies involved and pretty much meet all their needs? Well, Your Honor, I think that the facts show that by the time of the hearing, the strike had been going on for over a year, and the hotel was still operating in the same way then that they were operating three weeks into the strike, which was to use temporary agencies to cover the vast majority of the work plus employees who had crossed the picket line, former strikers, and only a minimal amount was being done by anybody else. The fact that they continued to operate in that manner for over a year I think shows that it was a sustainable method of operation for them, which is really the question that Travis looks at. Did they come up with a method where they could continue to operate on a long-term basis? But to get back to Your Honor's original question about is it a little strange that the hotel could be found to be at normal operations if in fact the union had taken away substantial business, this is a hotel. The hotel business fluctuates a great deal whether or not there's a strike. For seasonal reasons, due to changes in the economy and whether there are conventions in town or not, it's very common for a hotel to be at 80 percent occupancy one month and at 20 percent occupancy the next month. Are you saying that's really why the Department of Employment Security needed documentary evidence to show the real impact as opposed to normal fluctuations in business? Well, I would contend that even if they had shown that there was a loss of bookings that was truly related to the strike, I still would not believe that that would meet the test of Travis. But to the extent that the department considered that to be potentially relevant, then they certainly would need documentation and more than just somebody's general statement that, well, it's lower than it was last year. What if the hotels claim that the NLRB provides some sort of federal shield against disclosing the evidence that they otherwise claimed? I completely disagree with that, Your Honor. For one thing, the hotel did not ask for a protective order here, which they certainly could have done if they were concerned about the union misusing any facts that would come into their hands. There was actually, not to go into too much detail on this, but there was an NLRB proceeding that was winding up between the parties. It was in the process of being settled at the time of the evidentiary hearing, which provided that the hotel would have to turn over these very documents once some confidentiality agreement was signed. It hadn't been signed yet, but the parties were close to that. And so the hotels could have said, we'd like a continuance until we get our confidentiality agreement signed, or they could have said, we need a protective order. They never did that. One clarification for my sake. The date that we're talking about right before us in terms of when it resumed normal business operations, beginning with the claims adjuster's decision, what date was that, July? July 5, 2003, I believe. Oh, three. Yes, which was three weeks. And the date that the hearing officer determined that the hotel had resumed substantially normal business operations, which was? The hearing officer believed that? No, no, no. The second officer, not the director, the hearing officer. The hearing officer went in favor of Congress, but said the date isn't July 5, 2003. It is January or 04 or something like that. July 15, 04. July 15, 04. Your Honor, the hearing was held on July 15 of 04, but the director's representative, the hearing officer, found that substantially normal operations had not been resumed at any time. And then when it went up to the director, the director found that operations were normal. Had not been resumed at any time? I thought she said that it had been resumed as of the date of the hearing. I don't believe so, Your Honor. Okay. If I may touch on the burden of proof issue. Did the director's representative on September 1, 2005, issue a report recommending the claim's adjudicator's determination be modified to hold the claimants ineligible for unemployment benefits from June 15, 2005? That is correct. June 15, 2005. And the point being that everyone decided that they had resumed. The question is what date? What date? Well, that is what it says under recommended decision, Your Honor. But if you're looking at page 829 of the record, when you go up just above that to paragraph 3 of the conclusion, the director's representative found that the claimant's unemployment continues to be due to a stoppage of work, which exists because of a labor dispute. So I think all the party's understanding has always been that her mention of the July 15th date there was simply because that was when the record evidence ended, but I don't believe it was intended as a finding of eligibility beginning on that date. All right. We will file that transcript that I referred to, but even based on the materials that are already in the record, I would submit that it would be inappropriate and unfairly prejudicial to the claimants for the court to make any decision here based on placing the burden of proof on the claimants, because the Congress Hotel at the outset of the evidentiary hearing There are two different paths that we can take, either burden of proof or we can, as in Bridgestone, find a prima facie case that's been established by virtue of the claims adjuster's decision and basically the burden of going forward falls on the business. I don't know that there's any real distinction between the two. Well, we would certainly submit that their admissions, if nothing else, placed the burden on them at that point, but they also accepted the burden at the hearing, and that can be shown from their opening statement in which they talked about what they were going to establish, and had we been aware that the burden of proof was going to be placed on us, we would have and could have litigated the hearing very differently. But you don't have any subpoena rights. No, it is true we do have subpoena rights, Your Honor, but, however, strategically, if you're the party that does not bear the burden, you approach the hearing in a very different manner, and that's not something that could be remedied at this point after six years have passed. If I could address Travis briefly to the Court. You've been hearing a lot from the hotel about policy issues, but I think contrary to what they've suggested, we're not asking this Court to make any new policy decisions. The Supreme Court has already set out the test here, which is whether the employer had returned to substantially normal operations, and the Court and Travis basically define that as whether the work is getting done by methods that are sustainable in the long run. That's my paraphrase, but that's really the bottom line that comes out of Travis. Travis quoted at some length from a law review article by actually Judge Shader before he became Judge Shader, and the quotation takes up over 20 percent of the Supreme Court's opinion, so that gives some sense of how important it was to their analysis. And they quoted Judge Shader's article for the proposition that, quote, decisions should turn on whether the work can continue permanently on the new basis, unquote. And that's what occurred here. A year later, at the time when the hearing was going on, they were still doing the work the exact same way that they had been doing it on July 5th. And the facts in this case are strikingly different from Travis, which is why under the Travis's test, the Director correctly reached a different conclusion. In Travis, there were 700 salaried employees who left their jobs and took over doing exclusively production work. In this case, there were no salaried employees who left their jobs. In Travis, several of the employers' facilities were out of operation. Here, no part of the facility was out of operation. In Travis, work was deferred in five departments. Here, there's no evidence that work was deferred. In Travis, construction work was halted. There's no evidence of work being halted here. In Travis, the production was done by a skeleton force working abnormal hours and doing abnormal functions. But here, the hotel brought in as many temporary employees as it needed each day, based on occupancy, and the vast majority of the work was being done by those temp employees and by some strikers who had crossed over the picket line. So those people were doing exactly what they were hired to do, the temps and the crossovers. There was no abnormal function and no showing that they were working abnormal hours. I think I'm up with my time, Your Honor, and thank you. Good morning, Your Honors. May it please the Court. I'm Assistant Attorney General Carl Elias, appearing for the Illinois Department of Employment Security. I have a big amen to say with regards to what my co-counsel has just said. I think when the Court gets to the merits, Travis is the case that should hold your attention. It sets out the standard. Essentially, under Section 604, the question is, is there a labor dispute? And, of course, there is one here. Is there a work stoppage? That's a question. And whether there's a causal connection between the work stoppage. Travis makes clear that it's not necessary for the work stoppage always to affect output, although if output is affected, then that can be a consideration. In fact, Travis explains that there's all sorts of factual considerations which need to be made in deciding this case, or cases like this under Section 604. That brings me to what I think is the proper standard of review here, because it's under the standard of review that I would suggest the Court should apply the clearly erroneous standard. The director has a fair amount of discretion, because the agency has a fair amount of expertise in deciding these kinds of questions. In this case, the relevant decision, as Your Honor pointed out, is the supplemental decision of the director. That decision is a fairly lengthy one. It offers seven different observations about the case and comes to the conclusion that the work here was being done. The test under Travis is not whether all the work is being done or whether the employer's operations are back to normal. The test is whether it's substantially normal. And Travis even points out that substantial is necessarily one of those words that requires some factual analysis and consideration. When all the facts are considered in this case, the supplemental decision is very well supported. The fact that Mr. Souter told the department early on that everything was back to normal 100% at the hotel wasn't overly emphasized by the department. As I think my opponent suggests, they were given a fair amount of opportunities to explain that. In fact, the investigator gave them at least two, and I believe some time on the phone explaining it as well. At the hearing, they backed greatly away from that. But the director didn't lose sight of the fact that they were trying to say that they didn't really mean that everything was back to 100%. The cases allow for an employer to say, well, the striking employer's work is being done, but other work in our facility is not being done. That's the theory that I think the hotel is really pushing the court with. They're saying that we were able to get all the house staff's work done, but at the expense of management. And that would fit into the analysis that Travis has in a case called Union Starch, which follows Travis. But they didn't make that showing either. They didn't show that the managers that were doing the extra work that was being done had a substantial effect on their operations, unlike in Travis, as my co-counsel just explained, where there was lots of information that the court realized was there about what wasn't being done. There were 700 workers pulled off their desks and sent into the production facility. The court in Travis pointed out all the areas in which the evidence showed work was not being done. Shipping of oil was not being done in the same way that it had been prior to the strike. There was research and development that was postponed. The same is true with the Union Starch case, which I think is also one point. These cases went against the employees, but they had different facts, where there was this sort of evidence of work stoppage by management. I went very carefully through this record, looking for evidence of what work didn't get done at the hotel, and the only thing I could find was that the menu got changed in the restaurant a little bit, and the two people who testified testified they were working slightly longer hours, maybe 12 hours in the beginning. Your Honors talked about what is the relevant time frame here. The director's decision says that as of July 5, 2003, things were back to substantially normal, but the evidence went all the way through the date of that hearing. I don't think the hotel can prevail here by showing that on that particular day, three weeks after the strike. Well, what about the weddings that went from 20 to 6? The wedding evidence might have made something more compelling to the director if it had been fleshed out more with details, but they didn't provide the details. They testified that they observed there was less weddings, and as my co-counsel points out, the wedding evidence is necessarily going to fluctuate from season to season. Also, the wedding bookings, there was evidence that they take place about a year in advance, typically. So the people who were booking their weddings certainly didn't have any inkling about a labor dispute that was going to happen in the summer of 2003. I don't think it's necessarily a home run, even if there had been some evidence that the wedding bookings dropped. The question is whether they've returned to substantially normal operations. So for all of those reasons, the wedding bookings I don't think would carry the day. Just so it's clear, we shouldn't read the hearing officer's decision regarding the 7-15-04 date as the date on which she found the hotel had resumed substantially normal business operations. The director's representative said that work at the hotel had never gotten back to substantially normal, and the director disagreed with that decision. That brings up a point I'd like to make quickly. I think a lot of the hotel's arguments are about what the director's representative said. Those findings are not legally significant. The adjudicator's decision is. That was the first decision at the agency level, and that's the thing I think that would resolve the question if someone didn't appeal. They appealed. The ultimate decision is the director's. I was just going to say, regarding the burden of appeal, the protest that was filed by Congress, does that have anything to say or inform us of on the burden of proof, given that it is the hotel who at that point is challenging the claims adjudicator's decision? Yeah, I think at that point the question isn't really a burden of proof question, Your Honor, but as you suggested about Firestone, it's a question of burden of going forward. If one side has prevailed, that's the target that they can shoot at, and it's not fair for the claims adjudicator to say, I'm sorry, not the claims adjudicator, the director's representative to say the claims adjudicator says this. If you disagree, explain why. But the burden of proof should always be on the employer in these cases, as a case called BMAC explained. It is only the employer who really knows what is going on inside its facility, the strikers here outside. If I may make one side point, which really doesn't have anything to do with how the court should resolve the case, but I think I should bring it up because I think it matters. Our record here is a mess. There are volumes of material here, summonses that were sent to 185 employees of the Congress Plaza Hotel. This is relegated to a footnote in the briefs. But the question that it brings up is who should be sued here and how on administrative review. Mr. Wartman says that he sued everyone on administrative review because he was unsure of who should be sued. I think he's going to say that anyway.  But we had a real mess here with, you know, the department had 17 employee claims. I think it should have been 17 claims and maybe the union representative 17, and that should be the world that comes to this court on administrative review, not 185 people. I think they had to all pay appearance fees. It was a mess. So you're asking us to make sure that we make that clear? I clarify that, Your Honor. I don't think it's fair to take a position, but I think that that's the case. This is the first time, I believe, since the Supreme Court has held about associational standing that unions can appear for their employees like this. So there needs to be some sort of channeling as to what the procedure should be. All right. Thank you very much. Thank you, Counsel. Any questions? With regard to the last point made by the Counsel for the State, it certainly didn't give us any delight having to name all those people. And it was a new landscape for you. We're walking on untrodden waters, and I can assure you if we did name them, we'd have a motion to dismiss the next day saying no subject matter jurisdiction. I don't know if I'd go that far, but we can understand why you didn't. Your Honor, with regard to the point made by the Counsel for the State, he references that in the record the only changes that occurred with the hotel was a menu change and longer work hours. That, in my opinion, completely ignores the evidence that we put in that was unrebutted at 9-3. We had new workers coming in on a constant basis that we had to change. We were subject to bullhorn changes. But there was also testimony that there was always a large amount of turnover, so that training of new employees really didn't change the way the hotel had to operate anyway. Some 40 to 60 percent, I believe, the testimony was. But with regard to who's training them, you have coworkers that are established there that are capable of training them. Now we have managers who's training an entirely new allotment of workers who are transient. To say that our menus are the only things that change, we have mass protests that occur on a regular basis in front of this hotel. We have a union organizer that has devoted 20 percent of her time towards basically interfering with the Congress Hotel's operations. We had an abrupt termination of our health insurance and given just two weeks in order to proceed to get replacement health insurance. To say that the only thing that was affected with our operations is a change in menu and managers working longer hours completely ignores what the evidence presented at this hearing. And that's our issue with regard to this case. Counsel for the Union indicated that with the Travis case that picketing doesn't matter. I suggest in the Union Starts case, picketing was an observation that was picked up by the court. We normally don't have picketers standing in front of our business saying, stay away from the hotel. It not only is an important fact in deciding this case, it's a critical fact. Normal operations do not include employee harassment, customer harassment, solicitation of termination of services. The whole host of things pointed out that I won't repeat here, but to denigrate just what it is that was affecting our business to a simple summary of lack of menu and additional working hours just doesn't do justice to the record, nor is it, in my opinion, an accurate description of the record. Counsel for the Union also pointed out that the hotel business fluctuates, and I would suggest that there's certainly nothing in this record to indicate that this is a normal fluctuation. I think everybody could agree that with regard to an abrupt departure of 130 of our 220 workers, that is an abrupt and unbeknownst event that's ever occurred at the hotel. When you look at all the other cases, my final point, there isn't a single case that I've seen where a mere three weeks after a strike has began, a strike this large and this grand in detail, where the department has ever said, employer, you're back to normal operations, just three weeks. All the cases, and I think we've referred it in the reply brief, and I think it's appropriate to consider, it was months, and I believe the earliest that the employer had returned to substantial normal operations was six months after the strike began. I do want to say one other thing, and that concerns the motion to supplement the record with a proceeding in which they assert that the hotel assumed or accepted the burden of going forward at the evidentiary hearing, and to the extent that that record is filed and there's a dispute on that issue, both sides or all three sides are welcome to file short memoranda addressing that point. With regard to that, I'll take advantage of it. What did you say about six months? I believe all the cases where there's a determination on whether or not an employer had returned back to substantially normal operations, the earliest that the department had concluded that, I think, was six months. That means that the employer had been found to not have been engaged in substantially normal operations for six months, and it wasn't until after the six-month period that somebody had said, hey, this has gone on long enough, you're returned back to normal, and that's when the issue occurred. Thank you. Thank you. This matter will be taken under advisement.